UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIE K. WILKERSON,            )
                                )
        Petitioner,             )
                                )
v.                              )    CIVIL ACTION NO.
                                )    21-11503-DPW
COMMONWEALTH OF MASSACHUSETTS,)
                                )
        Respondent.             )

MEMORANDUM AND ORDER
May 20, 2022

This petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenges 2015 state court convictions of Willie K. Wilkerson for first-degree murder, MASS. GEN. LAWS ch. 265, § 1, and attempt to suborn perjury, MASS. GEN. LAWS ch. 268, § 3.

Mr. Wilkerson was convicted on June 23, 2015 after a jury trial and took a direct appeal. In April of 2017, he filed a motion for new trial in Massachusetts Superior Court, which was denied, a denial he also appealed. The Supreme Judicial Court consolidated Mr. Wilkerson's appeals. On November 4, 2020, the SJC in a comprehensive opinion affirmed Mr. Wilkerson's convictions and the denial of his new trial motion. *Commonwealth v. Wilkerson*, 156 N.E.3d 754 (Mass. 2020).

Mr. Wilkerson filed this petition *pro se* before me on September 13, 2021. He now raises four new claims for habeas relief: 1) that he received ineffective assistance of trial and

appellate counsel in the investigation of key witnesses and facts in his case; 2) that the evidence presented at trial was insufficient to support his first-degree murder conviction; 3) that defense counsel's failure to share exculpatory evidence with him deprived him of the opportunity to present a defense; and 4) that evidence newly made known to him suggests that his acquitted co-defendant may have been willing to aid in his defense at trial, but trial counsel failed to consider him as a potential witness.

Mr. Wilkerson has also filed what is, in substance if not in name, a motion for stay and abeyance of his habeas petition so that he may fully exhaust his new claims in state court. [Dkt. No. 12.]  The Respondent, the person responsible for Mr. Wilkerson's custody,[1] opposes Mr. Wilkerson's motion to stay

---

[1] Mr. Wilkerson's petition was docketed by the clerk with the Commonwealth of Massachusetts as the named Respondent.  Congress specified in 28 U.S.C. § 2243 that the proper Respondent in a petition for habeas corpus under 28 U.S.C. § 2254 is "the *person* having custody of" the petitioner (emphasis added).
  The "proper custodian for purposes of habeas review is the warden of the facility where [Mr. Wilkerson] is being held." *Hernandez* v. *Commonwealth*, 234 F. Supp. 3d 316, 322 (D. Mass. 2017).  For Mr. Wilkerson, apparently in custody at Massachusetts Correctional Institution, Norfolk, the proper Respondent to his habeas petition would presumptively be MCI Norfolk's Superintendent, Nelson Alves.  Although the Commonwealth of Massachusetts is not the correct Respondent in this case, I nonetheless consider Mr. Wilkerson's petition and motion to stay these proceedings as presented.  Here, the Superintendent of MCI Norfolk (or any other Massachusetts criminal custodian) "is within the jurisdiction of this court,

these habeas proceedings and moves for judgment on the
pleadings.

Mr. Wilkerson's case raises questions as to 1) what a state
habeas petitioner must do to present his claims fairly to the
state courts in the first instance and 2) what circumstances may
excuse a *pro se* petitioner's failure to exhaust his claims in
the state courts sufficient to justify staying his timely
commenced federal habeas corpus proceeding.  For the reasons
discussed herein, I will grant Mr. Wilkerson a stay and abeyance
for a reasonable time to pursue his new claims fully in the
Massachusetts state courts.

## I. BACKGROUND

I recite the facts relevant to Mr. Wilkerson's petition as
narrated by the Supreme Judicial Court in its decision in

---

the nominal respondent would be represented by the Massachusetts
Attorney General's Office which argues the merits in the instant
motion to dismiss, and the petition may only be amended to
remedy the error in identifying the nominal respondent."
*Hernandez*, 234 F. Supp. 3d at 322.  To delay or avoid addressing
Mr. Wilkerson's motion to stay in this case until this nominal
correction is undertaken, would be "improvident" and inefficient
under the circumstances.  *Id.*  I also note that the Respondent
need not wait for the *pro se* petitioner to amend the petition to
correct identification of the nominal respondent.  The
Massachusetts Attorney General's Office is fully capable — and
in the present setting, best situated — to file a motion to
correct the nominal Respondent at any time, though it has
neglected to do so as yet here.  *See Morin* v. *Kenneway*, No. 19-
30075-FDS, 2020 WL 1939701, at *1 (D. Mass. Apr. 22, 2020).  I
will order Respondent's counsel to do so in this case by June 1,
2022.

*Commonwealth* v. *Wilkerson*, 156 N.E.3d 754 (Mass. 2020), supplementing that narrative with facts in the record consistent with the SJC's opinion. *See O'Laughlin* v. *O'Brien*, 568 F.3d 287, 290 (1st Cir. 2009). I do so under direction that "[a]ny state court factual findings are presumed to be correct" unless the petitioner rebuts that presumption with clear and convincing evidence of error. *Clements* v. *Clarke*, 592 F.3d 45, 47 (1st Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)).

**A.   *Factual Background***

   1.   Mr. Wilkerson's Connection to the Decedent

   Mr. Wilkerson's relationship to the decedent, Kristopher Rosa, stems from Mr. Wilkerson's friendship with Rhandisyn Lawrence. Mr. Wilkerson befriended Mr. Lawrence while the two were in high school. *Wilkerson*, 156 N.E.3d at 762. Around this time, Mr. Lawrence in turn developed a hostile relationship with Mr. Rosa. *Id.* Mr. Lawrence dated another classmate, Davina Mendes, on and off throughout their school years, until Ms. Mendes "settled into a relationship" with Mr. Rosa. *Id.* Mr. Rosa and Ms. Mendes continued dating after high school and had a child together. *Id.*

   Even after leaving school, Mr. Lawrence and Mr. Rosa bore one another significant animosity; that animosity culminated in a series of violent exchanges in the months and days leading up

to Mr. Rosa's shooting death on September 19, 2011. *Id.* In April of 2011, Mr. Rosa, Ms. Mendes, and a friend drove to Mr. Lawrence's home, where an altercation took place. Mr. Rosa entered the home and when he and Mr. Lawrence came outside a half hour later, Mr. Lawrence's face was bloodied and his jaw broken. *Id.* at 762-63. On September 13, 2011, six days before the shooting, Mr. Rosa "threw a rock through the rear window of Lawrence's gray Volvo" in response to Mr. Lawrence's "unpleasant exchanges" with Ms. Mendes. *Id.* at 763.

Shortly before the shooting, Mr. Lawrence visited his friend, the petitioner, and told him of the beating Mr. Lawrence had suffered at Mr. Rosa's hands. According to testimony from Mr. Wilkerson's girlfriend, Ms. Burgess, Mr. Lawrence told Mr. Wilkerson that they "needed to take care of what they needed to take care of and handle it." *Id.* at 772.

<u>2.   The Fatal Shooting and Homicide Investigation</u>

On September 19, 2011 around 9:30 P.M., Mr. Rosa suffered multiple gunshot wounds while driving in Avon, Massachusetts; he died shortly thereafter. *Wilkerson*, 156 N.E.3d at 763.

Around 9:15 that evening, Mr. Rosa and Ms. Mendes departed Mr. Rosa's home to attend dinner at his mother's house. *Id.* As the pair approached their car in the driveway, Mr. Rosa observed a gray Volvo belonging to Mr. Lawrence driving toward the

driveway.  Mr. Rosa demanded the keys from Ms. Mendes and urged her into the passenger seat.  *Id.*

Mr. Rosa drove in pursuit of Mr. Lawrence's car; when Mr. Lawrence made a U-turn, Mr. Rosa followed.  Mr. Rosa and Ms. Mendes eventually spotted Mr. Lawrence in his gray Volvo, parked in a driveway.  Mr. Rosa "made another U-turn and parked diagonally, facing Lawrence's vehicle."  *Id.*  Mr. Lawrence then pulled out in front of Mr. Rosa and Ms. Mendes so that their car was again trailing Mr. Lawrence's Volvo.  *Id.*

Moments later, Mr. Rosa and Ms. Mendes heard gunshots from *behind* their car.  *Id.*  The first round of bullets shattered their rear window.  Ms. Mendes ducked into the seat while Mr. Rosa searched for the shooter in the rearview mirror.  The gunshots resumed "this time from the driver's side of the vehicle."  *Id.*  Bullets struck Mr. Rosa; Ms. Mendes saw him bleeding from the mouth and climbed into the driver's seat.  Ms. Mendes was able to prevent their car from colliding with Mr. Lawrence's Volvo, which had stopped in front of them.  Ms. Mendes then drove Mr. Rosa to Good Samaritan Hospital, where he was pronounced dead.  *Id.*

The morning after the shooting, police interviewed Mr. Lawrence.  *Id.*  Mr. Lawrence gave police permission to review his cell phone call history, which revealed that he had

6

exchanged calls with Mr. Wilkerson around 8 P.M. and just after 9 P.M. on the night of the shooting. *Id.* That evening, Massachusetts State Troopers John Banick and Brian Brooks interviewed Mr. Wilkerson in his Taunton apartment. *Id.* [Dkt. No. 14-10 at 13.] Mr. Wilkerson told the Troopers that Mr. Lawrence was a friend of Mr. Wilkerson and his brother Keith. Both Mr. Lawrence and Keith, he said, visited his home the night before around 8:30 P.M. but left shortly thereafter. [Dkt. No. 14-10 at 17.] When asked where he was on the night of the shooting, Mr. Wilkerson told the Troopers he was home babysitting his girlfriend's son. *Id.* Mr. Wilkerson said that his girlfriend, Amanda Burgess, arrived home from work around 9:20 P.M. and they both stayed in the apartment that night. Mr. Wilkerson denied having been in Avon the previous evening. [Dkt. No. 14-10 at 18.]

In her first statement to police, Ms. Burgess corroborated Mr. Wilkerson's statement. *Id.* Her account changed, however, after she received a subpoena to appear before the grand jury in this case. *Id.* at 763-64. Officers "confronted [her] with records from her cellular telephone service provider tending to show [Mr. Wilkerson] had left their apartment on the evening of the shooting, and Burgess conceded to the police, and to the grand jury, that she and Mr. Wilkerson had not been together

throughout the evening." *Id.* at 764.  Ms. Burgess told
investigators that she originally gave her false account because
Mr. Wilkerson instructed her to "say we were together all night"
if anyone asked her about the shooting.  *Id.*  [Dkt. No. 14-8 at
131.]

### 3.   Ms. Burgess's Immunity Agreement

On the basis of her recanted initial statements, Ms.
Burgess was charged in December 2012 with misleading the police.
More than six-months pregnant and unable to make bail, Ms.
Burgess remained incarcerated for over two months.  By the time
she was released, she and Mr. Wilkerson had ended their
relationship.  In July of 2013, Ms. Burgess signed an immunity
agreement, with the understanding that the charges against her
would be dismissed in exchange for her testimony.  *See id*. at
764.  [Dkt. No. 14-9 at 12, 99.]

### 4.   Trial and Conviction

The Commonwealth pursued its first-degree murder charge
against Mr. Wilkerson on a theory of deliberate premeditation.

Ms. Burgess's testimony was the cornerstone of the
Commonwealth's case.  The SJC summarized the key details of her
testimony in its decision:

> Lawrence began visiting [Mr. Wilkerson]'s and her
> apartment more frequently shortly before the shooting.
> On September 19, 2011, the night of the shooting, [Mr.
> Wilkerson] told her that he could not pick her up from

work as planned, because he had to go with Lawrence "to take care of something." Her coworker, Heather Farris, drove her to the defendant's mother's house, where [Mr. Wilkerson] had left her son. She was driving home with Farris, while talking on the telephone with [Mr. Wilkerson], when [she] saw him drive by in the front passenger seat of a gray Volvo going the opposite direction. Lawrence was driving. She believed that they "beeped" at them as the Volvo continued in the opposite direction, towards Avon.

After she picked up her son, Burgess repeatedly tried to call [Mr. Wilkerson]; sometimes she spoke with him, and some of her calls went unanswered. When she reached [Mr. Wilkerson] at some point after 9:30 P.M., he told her that "he took care of what he had to take care of" and "did what he had to do." [Mr. Wilkerson]'s sister drove Burgess home; as Burgess arrived at her apartment, she saw [Mr. Wilkerson] sitting on the front stairs and Lawrence's Volvo being driven away. After [Mr. Wilkerson]'s sister left, she saw [Mr. Wilkerson] take a black gun from his waistband and put it under the mattress. He said again that he "did what [he] had to do." Sometime later, he told her that he "wasn't sure if he killed [Mr. Rosa] or not because the car was still rolling" after he approached it and shot through the rear and side windows.

The next morning, Burgess noticed [Mr. Wilkerson] searching the Internet for news about a shooting in Avon. Forensic analysis of the laptop computer later revealed searches for "Avon shooting," and "Avon man dead." Burgess called her aunt, who brought a vehicle and dropped off [Mr. Wilkerson] at his father's home in the Dorchester section of Boston. Before [Mr. Wilkerson] left, Burgess saw him retrieve the gun from under the mattress and place it in a backpack, which he took with him. Burgess never saw the gun again. When [Mr. Wilkerson] returned from his father's home later that night, he had changed clothes. He explained that he had changed because he got gasoline on his shirt, which "gets rid of the gunpowder." He told Burgess to tell anyone who asked that they had been together all evening on the evening [Mr. Rosa] was killed.

*Wilkerson*, 156 N.E.3d at 764. Ms. Burgess also recounted Mr.

Lawrence's statements to Mr. Wilkerson, shortly before the shooting, that they "needed to take care of what they needed to take care of and handle it."[2]  *Id.* at 772.

In addition to Ms. Burgess's testimony, the Commonwealth presented cell site location information (CSLI) from Mr. Wilkerson's cell phone for a three-hour period between 8 P.M. and 11 P.M. on the night of the shooting.[3]  *Id.* at 764-65.  The jury could have found that CSLI data to be "consistent with a round trip drive from the defendant's apartment in Taunton to the scene of the shooting in Avon – at the time of the shooting – and back to Taunton."  *Id.* at 765.  The jury was also presented with CSLI data from Mr. Lawrence's cell phone which was "consistent with a round trip drive from Taunton to Avon and back."  *Id.*

---

[2] The trial court admitted the statements as non-hearsay statements by Mr. Wilkerson's alleged coventurer.  The court instructed the jury before the admission of Ms. Burgess's testimony that they were not to consider Mr. Lawrence's statements unless they first found the statements were made in furtherance of an existing conspiracy between Mr. Lawrence and Mr. Wilkerson.  *Wilkerson*, 156 N.E.3d at 772.  [Dkt. No. 14-9 at 22.]

[3] The Commonwealth originally obtained forty-eight hours of cell site location data for Mr. Wilkerson's cell phone pursuant to 18 U.S.C. § 2703(d).  The trial judge suppressed all CSLI data, except for the three-hour period immediately before and after the time of the shooting, as evidence obtained in violation of Mr. Wilkerson's Fourth Amendment right to a reasonable expectation of privacy.  *See generally Carpenter* v. *United States*, 138 S.Ct. 2206, 2221 (2018).

The Commonwealth argued that Mr. Wilkerson and Mr. Lawrence planned to take care of Mr. Rosa by ambushing him on the street in Avon.  Mr. Lawrence allegedly lured Mr. Rosa to where Mr. Wilkerson was waiting to shoot at his car from behind.  [Dkt. No. 14-11 at 111-113.]  The Commonwealth argued, based on Ms. Burgess's testimony, that Mr. Wilkerson then attempted to prevent her from telling investigators and the grand jury the truth about his whereabouts on the night of the shooting.  [Dkt. No. 14-11 at 119.]

   5.  The Defense Case at Trial

Defense counsel pointed to what he characterized as the many "gaps" in the Commonwealth's case including the Commonwealth's failure to present forensic evidence, eye-witness testimony, or evidence of a motive tying Mr. Wilkerson to the shooting.  [Dkt. No. 14-11 at 102-104.]  Ms. Burgess's testimony alone, defense counsel argued, implicated Mr. Wilkerson, and Ms. Burgess had every reason to fabricate her account.  On cross-examination, defense counsel elicited testimony from Ms. Burgess that:

- Ms. Burgess separated from Mr. Wilkerson after the shooting because she believed him to be cheating.  When Ms. Burgess was arrested in 2012 and could not make bail, she told her cousin that she was desperate to be released from jail but

she didn't have anything to give to the police to bargain for a dismissal of her case.  [Dkt. No. 14-9 at 86.]

- One week before Ms. Burgess provided key information to the Commonwealth and signed an immunity agreement, Ms. Burgess sent Mr. Wilkerson a series of hostile messages on social media, one of which said "I'm going to have you arrested and go to jail for a long time, so enjoy life while you can."  [*Id.* at 89.]

- Ms. Burgess came forward with the most inculpatory details of her account when she bargained for an immunity agreement in July of 2013.  [Dkt. No. 14-11 at 93.]

The Commonwealth's CSLI evidence, the defense contended, could not be relied upon to place Mr. Wilkerson in the vicinity of the shooting.  The Commonwealth could produce "no scientific evidence from a qualified engineer" to show that CSLI data could place someone with "any degree of certainty."  [Dkt. No. 14-11 at 99.]

On June 23, 2015, the jury found Mr. Wilkerson guilty of first-degree murder on a theory of deliberate premeditation, and of attempting to suborn perjury by inciting or procuring Ms. Burgess to commit perjury.  *Wilkerson*, 156 N.E.3d at 765-66. Mr. Wilkerson received a sentence of life without the possibility of parole on his murder conviction and a concurrent

sentence of three years on his conviction for suborning a perjury. [Dkt. No. 14-15 at 8.]

**B.    *Travel of the Case***

   1.   Completed Appeals to the SJC

Mr. Wilkerson timely appealed his convictions to the Supreme Judicial Court. Mr. Wilkerson thereafter filed a motion for a new trial in the SJC, which was remanded to the Superior Court on December 2, 2016. [Dkt. No. 14 at 12.] The Superior Court denied Mr. Wilkerson's motion for new trial,[4] finding "no credible reason to doubt the fairness of the trial." *See Commonwealth* v. *Wilkerson*, No. 1382CR00775, Paper 96 (Norfolk Super. May 9, 2017). Mr. Wilkerson appealed the denial of his

---

[4] Mr. Wilkerson raised the following six arguments in support of his motion for new trial: 1) that he was denied the right to be present in court during the discussion of a jury's question and that counsel was ineffective for failing to ensure his presence; 2) that defense counsel should have requested a continuance due to the delayed disclosure of Trooper Banik's notes from Mr. Wilkerson's police interview; 3) that the court erred in instructing the jury on immunized witnesses during Ms. Burgess's direct testimony as opposed to before her testimony; 4) that defense counsel was ineffective for failing to call Mr. Lawrence's girlfriend, Nivalda Barros, to testify that he told her that he was with Keith Wilkerson on the night of the shooting; 5) that misjoinder of Mr. Wilkerson's perjury and murder charges prejudiced Mr. Wilkerson; and 6) that he was denied his public trial rights. *See Commonwealth* v. *Wilkerson*, No. 1382CR00775, Paper 96 (Norfolk Super. May 9, 2017).
   Judge Wilkins, the trial and motion judge, found that none of Mr. Wilkerson's claims warranted a new trial, given the evidence presented against him at the original trial. *Id.*

new trial motion and his convictions to the Supreme Judicial
Court.  [Dkt. No. 14 at 13.]

     a.   *Mr. Wilkerson's Appellate Arguments*

     Before the SJC, Mr. Wilkerson raised seven issues he argued
required reversal of his convictions: 1) that the court erred in
admitting the three hours of his CSLI data; 2) that the court
erroneously admitted hearsay statements of Mr. Lawrence as
statements of a coconspirator; 3) that the charges of murder and
suborning perjury were misjoined; 4) that he was entitled to a
missing witness instruction and an instruction that the jury
could consider the police's failure to take certain
investigative steps; 5) that the court erred in preventing the
jury from learning that Mr. Lawrence was acquitted of Mr. Rosa's
murder[5]; 6) that the prosecutor made prejudicial improper
statements in closing argument; and 7) that the ends of justice
would be served by granting him a new trial "due to the
cumulative errors and the insufficiency of the evidence."  [Dkt.
No. 14 at 23.]

     b.   *The Supreme Judicial Court's Decision*

     The Supreme Judicial Court affirmed Mr. Wilkerson's
convictions and the Superior Court's denial of his new trial

---

[5] Mr. Lawrence was tried to an acquittal before the start of Mr.
Wilkerson's trial.  *Wilkerson*, 156 N.E.3d at 766 n.6.

motion on November 4, 2020.  *Wilkerson*, 156 N.E.3d at 778.  It
found none of Mr. Wilkerson's seven claims warranted the
reversal of his convictions.[6]  Relevant to Mr. Wilkerson's
current petition, the SJC reviewed, pursuant to MASS. GEN. LAWS ch.
278, § 33E, Mr. Wilkerson's case in its entirety for any factual
issue or legal error that would raise a substantial likelihood
of a miscarriage of justice.  Only in the context of its Section
33E analysis did the SJC appear to consider the sufficiency of
the evidence presented at trial.  The SJC ultimately found "no
reason to order a new trial or reduce the verdict."  *Wilkerson*,
156 N.E.3d at 778.

      2.   <u>Subsequent State Challenge to the Convictions</u>

          a.   *Mr. Wilkerson's Efforts to Obtain Post-Conviction*
              *Counsel*

On August 6, 2021, Mr. Wilkerson filed a motion in Superior
Court for the appointment of post-conviction counsel from the
Committee for Public Counsel Services.  [Dkt. No. 14 at 11.]
Mr. Wilkerson sought counsel to litigate "issues surrounding the

---

[6] Only one of Mr. Wilkerson's claims on appeal is even arguably
repeated in the habeas petition before me.  I will not restate
at this point the SJC's reasons for rejecting Mr. Wilkerson's
several appellate arguments.  I note, however, that I have
carefully, albeit preliminarily, reviewed the SJC's analysis as
to each of them and find no basis for concluding that the SJC's
decision was objectively unreasonable given the factual record
and clearly established Federal law.  *See generally Williams* v.
*Taylor*, 529 U.S. 362, 409 (2000); *Harrington* v. *Richter*, 562
U.S. 86, 98 (2011).

ineffective assistance of counsel and Newly Discovered evidence not previously known to him."[7]  Motion To Appoint Counsel, *Wilkerson*, No. 1382CR00775, Paper 117 (Norfolk Super. Aug. 8, 2021).  On August 23, 2021, the Superior Court Judge denied the motion without prejudice, indicating he would allow Mr. Wilkerson to refile his motion with a more detailed explanation of his claims.  Mr. Wilkerson, however, did not refile his motion to appoint counsel.  *See generally Wilkerson*, No. 1382CR00775, Paper 117 (Norfolk Super. Aug. 23, 2021).

> b.  *Mr. Wilkerson's Petition for a Federal Writ of Habeas Corpus*

Mr. Wilkerson, proceeding *pro se*, then filed his petition for habeas corpus pursuant to 28 U.S.C. § 2254 in this court on September 12, 2021.

Mr. Wilkerson raises four grounds for relief in the instant petition.  <u>First</u>, he asserts trial and appellate counsel provided constitutionally ineffective assistance by failing to investigate and interview potential witnesses, including Mr. Lawrence.  <u>Second</u>, Mr. Wilkerson contends that the evidence

---

[7] I consider Mr. Wilkerson's filings in Superior Court as essential documents upon which his motion to stay these habeas proceedings is premised and consequently I take judicial notice of them.  *Womack* v. *Saba*, No. CIV.A. 11-40138-FDS, 2012 WL 685888, at *2 (ECF No. 23) (D. Mass. Mar. 1, 2012) ("Petitioner . . . has filed motions in state court asserting his unexhausted claims.  The Court will take notice of the filings as public records.").

presented at trial was insufficient to support his first-degree murder conviction.  Given the lack of evidence tying him to the shooting, Mr. Wilkerson claims, the jury would have had to rely on impermissible inferences to find each element of the offense beyond a reasonable doubt.  <u>Third</u>, Mr. Wilkerson asserts that he was deprived of the opportunity to raise a full defense because his counsel failed to supply him with his full case file and withheld evidence.  <u>Fourth</u>, Mr. Wilkerson raises the similar and perhaps related claim that he only recently discovered the exculpatory contents of an affidavit submitted to counsel by his acquitted co-defendant, Mr. Lawrence, and was therefore unable to raise claims related to the affidavit on appeal.

The Commonwealth moves for judgment on the pleadings. Asserting Mr. Wilkerson failed to exhaust his claims in the state courts, as required by 28 U.S.C. § 2254(b), the Commonwealth contends he is barred from federal habeas review in district court.

Since filing his petition before me, Mr. Wilkerson has filed a *pro se* "Motion for Leave to Stay State Court Proceeding."  [Dkt. No. 12.]  Though perhaps misleading in its title, Mr. Wilkerson's motion, in substance, requests that I stay proceedings and hold in abeyance the instant federal habeas petition while he works to exhaust his claims in the state

courts.  Since filing his motion to stay in this court, Mr.
Wilkerson has filed a Motion for New Trial pursuant to MASS. R.
CRIM. P. 30(b) in Superior Court, raising in somewhat greater
detail the same claims now raised before me.  *See* Motion for New
Trial, *Wilkerson*, No. 1382CR00775, Paper 118 (Norfolk Super.
Dec. 15, 2021).

On March 21, 2022, Judge Wilkins, who continued to preside
over the case in the Superior Court, denied Mr. Wilkerson's
motion without an evidentiary hearing, finding Mr. Wilkerson's
claims did not raise a substantial issue that could merit a new
trial.  *Wilkerson*, No. 1382CR00775, Paper 127 (Norfolk Super.
Mar. 21, 2022).  It appears from the state court dockets that
Mr. Wilkerson has not, as of yet, sought leave to appeal the
denial of his Motion for New Trial from the Supreme Judicial
Court.  As further discussed *supra*, he must do so in order to
exhaust his claims fully in the state courts.

## II. STANDARD OF REVIEW

Section 2254, as amended by the Antiterrorism and Effective
Death Penalty Act of 1996 (AEDPA), imposes a demanding burden on
a petitioner who seeks federal habeas corpus relief from his
state convictions.  Under Section 2254(d), a petitioner may
obtain relief only if he demonstrates that the state court's
adjudication of his claims:

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or (2) resulted in a decision
> that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

It is well-established that a state court's error in deciding a factual or legal issue, alone, does not merit habeas relief under AEDPA. Instead, the petitioner must show the state court's decision was "objectively unreasonable" given the factual record and clearly established Federal law. *Williams v. Taylor*, 529 U.S. 362, 409 (2000). The district court's task is to determine "whether a state court's decision resulted from an unreasonable legal or factual conclusion." *Harrington* v. *Richter*, 562 U.S. 86, 98 (2011).

Mr. Wilkerson filed his petition for habeas corpus and motion to stay without the benefit of counsel. I therefore construe his pleadings liberally and hold them to "less stringent standards than formal pleadings drafted by lawyers." *Erickson* v. *Pardus*, 551 U.S. 89, 93 (2007)(per curiam); *Hobson* v. *Corsini*, 133 F. Supp. 3d 297, 304 (D. Mass. 2015).

### III. DISCUSSION

### A.   *The Exhaustion Requirement*

Section 2554 makes clear that "a habeas petitioner

challenging a state conviction must first attempt to present his claim in state court." *Harrington*, 562 U.S. at 103 (citing 28 U.S.C. § 2254(b)).  The petitioner's duty to exhaust his state appellate remedies before seeking relief from the federal courts "ensure[s] that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." *Id.*  In accordance with principles of federalism, "the state courts have the obligation, and must be trusted, to take first cognizance of a defendant's claim of federal right. . . . While exhaustion is not a jurisdictional bar, only in rare cases will federal courts reach an unexhausted claim." *Nadworny* v. *Fair*, 872 F.2d 1093, 1096 (1st Cir. 1989) (citations omitted). A petitioner exhausts his claims sufficiently to satisfy § 2254(b)'s requirements when he fairly presents "factual and legal underpinnings" of his federal claims to the state's high court. *Jackson* v. *Coalter*, 337 F.3d 74, 86 (1st Cir. 2003) (quoting *Nadworny*, 872 F.2d at 1096).  A claim is fairly presented when the petitioner articulates it "in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." *Scarpa* v. *Dubois*, 38 F.3d 1, 6 (1st Cir. 1994).  To satisfy this exhaustion requirement, a petitioner must do more than "simply present [his] claims to the state trial court; [he] must

20

'invoke[ ] one complete round of the State's established appellate review process.'" *Currie* v. *Matesanz*, 281 F.3d 261, 267 (1st Cir. 2002) (quoting *O'Sullivan* v. *Boerckel*, 526 U.S. 838, 845 (1999)).  As to the claims raised and denied in the Superior Court, a petitioner has exhausted them only upon "the final disposition of a timely appeal or request for allowance of appeal." *Currie*, 281 F.3d at 267.

I now consider whether Mr. Wilkerson fulfilled his obligation to raise and exhaust each of his newly asserted claims before the state courts.

1.   Mr. Wilkerson Failed to Exhaust his Ineffective Assistance Claim, Withheld Evidence Claim, and Newly Discovered Evidence Claim

It is clear that Mr. Wilkerson failed to exhaust in the state courts three of his four newly asserted grounds for habeas relief.  Mr. Wilkerson acknowledges his claim that counsel was ineffective for failing to interview and investigate key witnesses is raised before me in this pending federal habeas petition without full state court adjudication.  I find Mr. Wilkerson also raises before me — without first exhausting his state appellate remedies — that counsel withheld evidence from his trial file and that Mr. Wilkerson was thereby deprived of the opportunity to mount a full defense.

These claims have not been presented to or considered by

21

the SJC in any fashion.  Mr. Wilkerson did present these issues
*pro se* to the Superior Court in his most recent Motion for New
Trial, but he has yet to begin the process of seeking the SJC's
review of the recent adverse determination in the Superior Court
by undertaking appeal of the denial of that motion.

A capital defendant who receives plenary review of his
conviction on direct appeal may file subsequent motions for new
trial in Superior Court but cannot appeal the denial of those
new trial motions without first obtaining leave from the
SJC.  *Drew* v. *MacEachern*, 620 F.3d 16, 17 (1st Cir. 2010); *Lee*
v. *Corsini*, 777 F.3d 46, 55 (1st Cir. 2015).  A defendant
seeking to appeal must file a "gatekeeper" petition to a Single
Justice of the SJC under Mass. Gen. Laws ch. 278, 33E, explaining
why his new trial motion raises a new and substantial question
that merits consideration by the full court.  *Lee*, 777 F.3d at
55.  Mr. Wilkerson apparently has not filed a gatekeeper
petition seeking leave to appeal the Superior Court's denial of
his post-conviction claims.[8]

---

[8] The text of Section 33E does not specify the time by which a
defendant must file a gatekeeper petition with the Single
Justice in order for his petition to be timely.  The Supreme
Judicial Court did hold in *Mains* v. *Commonwealth*, 739 N.E.2d
1125, 1131 n.10 (Mass. 2000), that a gatekeeper petition should
be filed within thirty days of the denial of the defendant's new
trial motion.  *See Mandeville* v. *Gaffney*, 167 N.E.3d 416, 418
(Mass. 2021).  I note that under this holding Mr. Wilkerson's
thirty-day-period to file a gatekeeper petition has elapsed.  An

Because these three claims have not been resolved with finality by the SJC, I may not at this point consider them as potential grounds for federal habeas relief.  *Nadworny*, 872 F.2d at 1096.  I observe by contrast, however, Mr. Wilkerson's insufficiency claim was at least arguably included in his appellate brief in his direct appeal and requires further discussion.[9]

> 2. <u>Mr. Wilkerson's Insufficiency Claim, Although Mentioned, was Not Fairly Presented to the SJC on Appeal and is Unexhausted</u>

In his appellate brief to the SJC, Mr. Wilkerson asserted

---

untimely petition is not necessarily doomed to fail, however, because a Single Justice may yet determine that the petition raises new and substantial issues that the full court should consider on appeal.  *See Drew* v. *MacEachern*, 620 F.3d 16, 21 n.2 (1st Cir. 2010)(citing *Commonwealth* v. *Nassar*, 908 N.E.2d 371, 372-73 n.2 (Mass. 2009)).  Until Mr. Wilkerson has actually filed a gatekeeper petition and has received a decision, either from the Single Justice denying his petition or from the full court considering an appeal of his motion, he will not have exhausted his state remedies as required by § 2254(b).  *See id.* at 21 (denial of gatekeeper is a "final resolution through [Massachusetts's] post-conviction procedures" (quoting *Carey* v. *Saffold*, 536 U.S. 214, 220 (2002)).

[9] The Commonwealth contends Mr. Wilkerson "admits" in his petition that he failed to exhaust his claims by answering "all of them?" to the question whether any of his asserted grounds had not been presented in state or federal court. [Dkt. Nos. 16 at 3, 1 at 11.]  I review Mr. Wilkeron's *pro se* petition liberally and assign no weight in my exhaustion analysis to this so-called "admission" by a *pro se* litigant.  As will appear in the next sub-section, however, I find without reference to Mr. Wilkerson's purported "admission" that he has not fully exhausted his newly articulated federal claims in the state courts.

that the evidence presented to the jury, particularly what he treated as the incredible testimony of the immunized witness, Ms. Burgess, was insufficient to convict him of first-degree murder.  I find that although Mr. Wilkerson mentioned in passing that the evidence against him was insufficient, this was presented as a state law claim.  Any federal insufficiency claim remains unexhausted.

In *Jackson* v. *Virginia*, 443 U.S. 307 (1979), the Supreme Court articulated the federal constitutional standard of evidentiary sufficiency required to support a conviction: viewed in the light most favorable to the prosecution, the evidence must have been sufficient to allow a "rational trier of fact [to] have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319.  Mr. Wilkerson's seventh argument on appeal to the SJC was that, pursuant to MASS. GEN. LAWS ch. 278, § 33E, "justice will be served by granting a new trial due to the cumulative errors and the insufficiency of the evidence."  Mr. Wilkerson summarized the confluence of factors that necessitated a new trial as the circumstance that: 1) his conviction was supported only by uncorroborated, immunized witness testimony of Ms. Burgess, an outcome prohibited by MASS. GEN. LAWS ch. 233, § 20I; 2) the lack of corroboration of Ms. Burgess's "compromised and impeached testimony," cast serious

24

doubt on the integrity of his conviction;  3) evidence contradicting the Commonwealth's theory of the shooting undermined the evidence of his guilt; and 4) the lack of evidence of Mr. Wilkerson's motive to commit the murder, along with the lack of other evidence, all of which was said to suggest justice may not have been done.  [Dkt. No. 14 at 79-80.]

Mr. Wilkerson's SJC brief does mention the phrase "the insufficiency of the evidence," but he neither stated a federal insufficiency claim under *Jackson* v. *Virginia*, nor raised the analogous state law argument under *Commonwealth* v. *Latimore*, 393 N.E.2d 370, 375 (Mass. 1979).  Mr. Wilkerson's claim was, in essence, a request for discretionary relief under Mass. Gen. Laws ch. 278, § 33E, not an assertion that no reasonable jury could have found him guilty based on the evidence presented at trial. The promise of Section 33E review does not relieve a petitioner of his obligation separately to present fairly and recognizably a federal insufficiency claim to the SJC.  To the extent that Mr. Wilkerson raised a federal claim on appeal, his claim was "mask[ed by its] state-law character." *Nadworny*, 872 F.2d at 1101.  Mr. Wilkerson's brief, with its focus on state court discretionary process, would be unlikely to "alert a reasonable jurist to the existence of the federal question." *Id.*

### 3.    Treatment of the Newly Asserted but Unexhausted Claims at this Point in this Court

Because I find none of Mr. Wilkerson's claims have been presented to the SJC, I will not consider their merits at this time. *Nadworny*, 872 F.2d at 1096 n.2.  Mr. Wilkerson's failure to exhaust his claims is not necessarily fatal to his petition, however.  I turn to Mr. Wilkerson's request for what is, in essence, a stay and abeyance of those claims to provide him an opportunity to exhaust his claims in the SJC and then return to federal court.

### B.  *Motion for Stay and Abeyance*

A state petitioner for federal habeas corpus relief who has failed to exhaust any of his federal claims for habeas relief may seek a stay and abeyance of his petition to afford him the chance to litigate his claims for the first time in the state courts. *Rhines* v. *Weber*, 544 U.S. 269, 278 (2005); *Sena* v. *Kenneway*, 997 F.3d 378, 381 (1st Cir. 2021).  The Supreme Court explained the need for this stay and abeyance procedure in *Rhines* as a way to provide a petitioner a means to seek federal habeas review within AEDPA's one-year limitations period while he works diligently to present any unexhausted claims in the state courts.  544 U.S. at 275 (noting that petitioners who rush to file timely habeas petitions within a year of a final decision by the state court, as required by AEDPA, "run the risk

of forever losing their opportunity for any federal review of [any] unexhausted claims."). *See also Sena*, 997 F.3d at 381.

To make use of this stay and abeyance procedure, *Rhines* held, the petitioner must meet three requirements by showing he "had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." 544 U.S. at 278. I assess Mr. Wilkerson's motion to stay proceedings in light of those three prerequisites.[10]

---

[10] The *Rhines* Court described a stay and abeyance procedure available to petitioners who bring a "mixed" petition including exhausted and unexhausted claims. *Rhines* v. *Weber*, 544 U.S. 269, 278 (2005). Though the First Circuit has yet to address whether this procedure is also available to petitioners belatedly bringing only unexhausted claims, the Ninth, Third, Seventh, and Tenth Circuits have answered that question in the affirmative. *Mena* v. *Long*, 813 F.3d 907, 908 (9th Cir. 2016); *Heleva* v. *Brooks*, 581 F.3d 187, 191 (3d Cir. 2009); *Dolis* v. *Chambers*, 454 F.3d 721, 724 (7th Cir. 2006); *Doe* v. *Jones*, 762 F.3d 1174, 1178 (10th Cir. 2014). Several district courts in the First Circuit have also applied the *Rhines* framework to fully unexhausted petitions. *Watt* v. *Marchilli*, 217 F. Supp. 3d 434, 440 (D. Mass. 2016) (Hillman, J.); *Marchetti* v. *O'Brien*, No. CV 15-14161-GAO, 2016 WL 5660412, at *4 (ECF No. 32) (D. Mass. Sep. 29, 2016) (O'Toole, J.); *see also Sánchez-Burgos* v. *Vega-Aponte*, No. 18-1031-PAD, slip op. at 4 n.5 (D.P.R. Apr. 27, 2021)(Delgado-Hernández, J.). I agree with Judge Hillman's prediction in *Watt* v. *Marchilli*, that "if presented with the issue, the First Circuit is likely to align itself with those circuits that have held that federal courts have the authority to stay petitions containing only unexhausted claims." 217 F. Supp. 3d at 440. At this point, I will apply the *Rhines* framework to Mr. Wilkerson's motion to stay despite his failure to exhaust any of his claims.

1.   <u>Mr. Wilkerson Meets the *Rhines* Requirements for a Stay</u>
     <u>and Abeyance</u>

   a.   *Potentially Meritorious Claims*

First, Mr. Wilkerson's grounds for federal habeas relief
are not plainly meritless.  *Rhines*, 544 U.S. at 277.  Though not
developed in detail in his habeas petition, Mr. Wilkerson's
claims do raise potentially meritorious issues regarding the
quality of counsel's efforts to interview and obtain exculpatory
evidence from Mr. Wilkerson's acquitted co-defendant Mr.
Lawrence.  Further, to the extent that Mr. Wilkerson's third and
fourth grounds for habeas relief are based on Mr. Lawrence, they
are also not plainly meritless.[11]  Mr. Wilkerson's insufficiency
claim is also plausibly viable, given the quality of the
evidence presented at trial.

   b.   *Abusive Litigation Tactics*

I find no evidence in the record that Mr. Wilkerson has
engaged in abusive litigation tactics that would make him
ineligible for a stay and abeyance.

---

[11] Mr. Lawrence does appear to have submitted a signed, notarized
statement to defense counsel at some point stating that "On
September 19th, 2011 during my drive back from Taunton I was not
with Willie Wilkerson."  Although not entirely clear from his
statement, it appears that Mr. Lawrence may also have been
willing to appear on Mr. Wilkerson's behalf at trial.  Affidavit
ISO Motion for New Trial, *Wilkerson*, No. 1382CR00775, Paper 119
(Norfolk Super. Dec. 15, 2021).

c.   *Good Cause*

Mr. Wilkerson provides only a limited explanation as to why each of his claims was not presented on direct appeal.[12]  What Mr. Wilkerson does clearly articulate, however, is that he did not understand how to exhaust any of his claims without the assistance of counsel.  [Dkt. No. 1 at 11.]  The Commonwealth contends that Mr. Wilkerson's *pro se* status, along with his other explanations for his failure to present his claims, cannot excuse his procedural misstep.  This is a question requiring further development in the state courts.  For present purposes, I find that Mr. Wilkerson makes an adequate showing of good cause to excuse his failure to exhaust his claims in state court.

The Supreme Court has offered little guidance since *Rhines* regarding what constitutes "good cause" to justify a stay and

---

[12] As to his claim of ineffective assistance for counsel's failure to investigate and interview witnesses, Mr. Wilkerson states that his post-conviction appellate counsel was unwilling to investigate the issue and filed his direct appellate brief without notifying him.  [Dkt. No. 1 at 6.]  Mr. Wilkerson did not raise his insufficiency claim because he "didn't know how to and [his] appointed attorney was confused."  [Dkt. No. 1 at 7.]  Mr. Wilkerson asserts his appellate attorney did not want to raise his claim that his trial attorney withheld evidence from him, although he does not explain clearly why his attorney refused to do so.  Mr. Wilkerson explains that he failed to exhaust his claim based on Mr. Lawrence's affidavit because he learned of its contents too late to do so.  [Dkt. No. 1 at 9.]

abeyance.  *See Sena*, 997 F.3d at 385-86.  Until recently, First
Circuit courts have attempted to define good cause primarily by
deciding categorically what it is not.  *See id.*; *see, e.g.*,
*Clements* v. *Maloney*, 485 F.3d 158, 170 (1st Cir. 2007)
(counsel's intentional decision to omit a claim is not good
cause); *Josselyn* v. *Dennehy*, 475 F.3d 1, 5 (1st Cir. 2007)
("Ignorance of the law does not constitute good cause");
*Sullivan* v. *Saba*, 840 F. Supp. 2d 429, 437 (D. Mass. 2012) ("the
First Circuit does not recognize ineffective assistance of
counsel or strategic decisions of counsel as good cause in this
context.").  In particular, several district courts applying the
*Rhines* framework have emphasized that a petitioner's *pro se*
status also cannot constitute good cause.  *See Sullivan*, 840 F.
Supp. 2d at 437 ("Petitioner's *pro se* status does not constitute
good cause"); *Watt* v. *Marchilli*, 217 F. Supp. 3d 434, 440 (D.
Mass. 2016) ("A petitioner's *pro se* status, in and of itself,
cannot establish good cause.")

In its recent decision in *Sena* v. *Kenneway*, however, the
First Circuit emphasized that good cause analysis "is inherently
[a] fact-sensitive" one.  997 F.3d at 389.  The district court
is directed to conduct an individualized assessment based on
each petitioner's 1) ability to self-advocate, *id.* at 387; 2)
diligence in attempting to present his claims, *id.* at 386 ("a

movant's diligence or lack of diligence often serves as the dominant criterion in a good cause analysis" (internal citations and quotations omitted)); 3) efforts to navigate the procedural obstacles of exhaustion, *see Rhines*, 544 U.S. at 279 (Stevens, J., concurring) (the good cause requirement should not allow complex and inflexible exhaustion requirements to "trap the unwary *pro se* prisoner" (internal citations and quotations omitted)); and 4) the substantive character of the federal claims. *See Jackson* v. *Marshall*, 634 F. Supp. 2d 146, 163 (D. Mass. 2009).

In particular, the First Circuit instructs that in the case of a *pro se* petitioner the district court "must factor a habeas petitioner's pro se status, as well as his attributes, skill sets, and circumstances, into its decisional calculus" and consider the impact of the petitioner's *pro se* status on his ability to exhaust his claims. *Sena*, 997 F.3d at 387.

i.   Ability to Self-Advocate

In *Sena*, the First Circuit decided the "close" question of whether the district court abused its discretion by finding a petitioner's extensive efforts to obtain post-conviction counsel to help him exhaust his ineffective assistance of counsel claim did not constitute good cause. *Id.* at 384, 389.  The First Circuit found the district court's decision to be "within the

wide margins of [the district court's] discretion" because the petitioner was fully capable of filing an effective *pro se* motion to exhaust his claims but delayed initiating state court proceedings for six months after learning he would not be appointed counsel.  Critical to the First Circuit's decision to uphold the district court's ruling was that the court "supportably found that the petitioner was capable of acting to his own behoof at all times," and yet still made no effort to exhaust his claims *pro se* until it was too late.  *Id.* at 387.

Here, Mr. Wilkerson demonstrated repeatedly that he lacked the information, legal skills, and resources to exhaust his claims before filing the instant petition.  Mr. Wilkerson's *pro se* filings, unlike the "well-crafted" pleadings in *Sena*, *id.* at 388, do not evidence an ability to litigate complex claims of ineffective assistance of counsel and newly discovered evidence.[13]  *See also McCowen* v. *Mendosa*, No. CIV.A. 11-12216-FDS, 2012 WL 5875597, at *3 (ECF No. 13)(D. Mass. Nov. 19, 2012)

---

[13] The court in *Sena* considered a *pro se* petitioner who demonstrated his ability to self-advocate with what it characterized as "well-crafted" pleadings.  *See id.* at 388; *Sena* v. *Kenneway*, No. CV 19-10254-NMG, 2020 WL 1429849, at *2 (ECF No. 59) (D. Mass. Mar. 24, 2020).  I have reviewed Mr. Sena's comprehensive and detailed filings in support of his petition for habeas corpus and motion to stay.  They are far more sophisticated than Mr. Wilkerson's petition and motion before me.  By contrast to Mr. Sena, Mr. Wilkerson struggles to articulate the factual and legal bases for his arguments in the hand-written petition he has submitted in this case.

(finding good cause due to the *pro se* petitioner's "limited literacy and legal skills," when "dismissing the petitioner would almost certainly preclude him from returning to federal court.")  I find that Mr. Wilkerson's *pro se* status significantly impeded his ability to exhaust his claims before filing his habeas petition, particularly because his claims seem to require careful investigation and nuanced legal arguments regarding trial and appellate counsel's decision-making.

ii.  Diligence

Mr. Wilkerson has made sufficiently diligent efforts thus far to obtain counsel and present his claims to the Superior Court.  Mr. Wilkerson filed a motion in Superior Court for the appointment of counsel to represent him in filing a motion pursuant to MASS. R. CRIM. P. 25(b)(2) in August of 2021, over a month before filing his habeas petition before me.  He sought funds to order the transcripts of Mr. Lawrence's trial and recently sought an order for the production of those transcripts so that he could investigate discrepancies in the facts presented in the two trials.  Since filing his motion to stay, Mr. Wilkerson filed a Motion for New Trial pursuant to MASS. R. CRIM. P. 30(b), along with an affidavit in support of the motion and a copy of Mr. Lawrence's affidavit.  The Superior Court has now denied his motion for a new trial.  I am prepared to give

Mr. Wilkerson the opportunity to continue to demonstrate diligent efforts to exhaust his claims by filing a gatekeeper petition with the SJC by July 1, 2022.

### iii. Efforts to Navigate Exhaustion Procedure

Mr. Wilkerson attempted to obtain counsel specifically to allow him to "pursue remedies that will be considered exhausted or failed to exhaust before his federal habeas is due." Motion to Appoint Counsel, *Wilkerson*, No. 1382CR00775, Paper 117 (Norfolk Super. Aug. 8, 2021). When his attempts to obtain counsel were unsuccessful, Mr. Wilkerson timely filed his habeas petition and, before filing a supporting memorandum or any additional documents, alerted this court to his failure to exhaust his claims, accordingly seeking a stay. His affidavit filed in support of his motion to stay suggests that he also sought alternative means of obtaining counsel including a screening from the Boston College Innocence Program. [Dkt. No. 12-1.]

Mr. Wilkerson has already initiated the state court proceedings necessary to exhaust his claims by filing a Rule 30(b) motion in Superior Court. If he pursues that recently denied motion for new trial to a final resolution by filing promptly a gatekeeper petition to appeal to the SJC, he will

have demonstrated sufficient efforts to exhaust his claims to justify a stay of his federal habeas matter.

iv.   Substantiality of Federal Claims

I note that Mr. Wilkerson's ineffective assistance of counsel claims, withheld evidence claim, and newly discovered evidence claims seem to be predicated upon his discovery of Mr. Lawrence's willingness to aid in his defense, a discovery he asserts occurred after the SJC decided his case.  Mr. Wilkerson has already presented Mr. Lawrence's affidavit to the Superior Court in his efforts to exhaust these claims.

The discovery of new information following direct appeal will not always constitute good cause.  Here, however, Mr. Wilkerson presents at least some evidence that his acquitted co-defendant, with whom he was alleged to have conspired to commit murder, was willing to support his defense with testimony and yet was not called by trial counsel.  Mr. Wilkerson should have an opportunity to litigate these issues fully in the state courts and seek federal habeas review of his claims if he takes the steps necessary to exhaust them.[14]

---

[14] I understand that the Superior Court rejected Mr. Wilkerson's claims predicated on Mr. Lawrence's affidavit and "[i]t's certainly possible that all of this is for naught, as a gatekeeper justice may conclude that the information [Mr. Wilkerson raises] . . . is not new" or of sufficient substance to warrant an appeal to the full SJC.  *Jackson* v. *Marshall*, 634 F. Supp. 2d 146, 163 (D. Mass 2009).  "That decision, however,

I now conclude that Mr. Wilkerson has demonstrated sufficiently that good cause exists to excuse his failure, to this point, to exhaust his claims in state court.  Accordingly, I will grant his motion for a stay and abeyance.

## IV. CONCLUSION

For the reasons set forth above, I GRANT Mr. Wilkerson's inartfully captioned motion [Dkt. No. 12] for a stay of these proceedings.  Mr. Wilkerson will not, however, be afforded unlimited time to exhaust his claims.  This stay is conditioned on Mr. Wilkerson continuing to pursue his state court remedies diligently.  If Mr. Wilkerson hopes to pursue his federal habeas petition in this court, he must now file a petition with the SJC Single Justice under MASS. GEN. LAWS ch. 278, § 33E, explaining why he believes his Motion for New Trial raises new and substantial issues that should be considered in an appeal to the full SJC. Mr. Wilkerson must submit this gatekeeper petition to the SJC no later than July 1, 2022.  Mr. Wilkerson must then return to this court with a motion to reopen within thirty days after his current state motion for a new trial is finally decided.  *See Rhines*, 544 U.S. at 278.

---

is for the Commonwealth courts, not this one." *Id.*  Mr. Wilkerson must file his gatekeeper petition with the SJC to give that court the opportunity to make such a decision before he can litigate any of his claims in this federal court.

The Commonwealth-Respondent will be responsible for keeping this court apprised of the progress of Mr. Wilkerson's attempts to obtain post-conviction relief in the Massachusetts courts. Accordingly, it is ORDERED that the Commonwealth shall file a status report to this court within one week of the filing of a gatekeeper petition in the SJC, a decision of the Single Justice, and, if an appeal is granted, the filing of an appeal with the full court of the SJC.

The Commonwealth will also be responsible for filing a status report informing this court when this federal matter is ripe for resolution, in accordance with this Memorandum's discussion of Mr. Wilkerson's duty to exhaust his state court remedies.

It is further ORDERED that the Commonwealth shall, by June 1, 2022, file a motion to correct the identification of the nominal Respondent in this matter by reporting the name of the current institution with custody of Mr. Wilkerson and that institution's responsible custodian for Mr. Wilkerson. *See supra* note 1.

**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE